1    ROBBINS GELLER RUDMAN
        & DOWD LLP
2    BENNY C. GOODMAN III (211302)
     ERIK W. LUEDEKE (249211)
3    655 West Broadway, Suite 1900
     San Diego, CA  92101
4    Telephone:  619/231-1058
     619/231-7423 (fax)
5    bgoodman@rgrdlaw.com
     eluedeke@rgrdlaw.com
6
     Attorneys for Plaintiff
7
     [Additional counsel appear on signature page.]
8
                     UNITED STATES DISTRICT COURT
9
                    NORTHERN DISTRICT OF CALIFORNIA
10
                         SAN FRANCISCO DIVISION
11
     DAVID STACHOWSKI, Derivatively on      )   Case No. 3:20-cv-06525
12   Behalf of VAXART, INC.,                )
                                            )   [CORRECTED] VERIFIED
13                         Plaintiff,       )   SHAREHOLDER DERIVATIVE
                                            )   COMPLAINT FOR BREACH OF
14          vs.                             )   FIDUCIARY DUTY, UNJUST
                                            )   ENRICHMENT AND VIOLATION OF THE
15   STEVEN J. BOYD, TODD C. DAVIS,         )   FEDERAL SECURITIES LAWS
     MICHAEL J. FINNEY, ANDREI FLOROIU,     )
16   WOUTER W. LATOUR, KEITH MAHER,         )
     ROBERT A. YEDID and ARMISTICE          )
17   CAPITAL, LLC,                          )
                                            )
18                         Defendants,      )
                                            )
19          – and –                         )
                                            )
20   VAXART, INC., a Delaware corporation,  )
                                            )
21                  Nominal Defendant.      )
                                            )   DEMAND FOR JURY TRIAL
22   _____)
23
24
25
26
27
28

4838-0110-3307.v1-9/18/20

1    Plaintiff David Stachowski, by and through his undersigned attorneys, hereby submits this

2    Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Unjust Enrichment and

3    Violation of the Federal Securities Laws (the "Complaint") for the benefit of nominal defendant

4    Vaxart, Inc. ("Vaxart" or the "Company") against certain members of its Board of Directors (the

5    "Board") and/or executive officers and Armistice Capital, LLC ("Armistice"), seeking to remedy

6    defendants' breaches of fiduciary duties, unjust enrichment, and violations of §14(a) of the Securities

7    Exchange Act of 1934 ("Exchange Act").

8                              **NATURE OF THE ACTION**

9    1.    Vaxart is a clinical-stage biotechnology company primarily focused on the

10   development of oral recombinant vaccines based on a proprietary oral vaccine platform.  Armistice

11   is a hedge fund that, until very recently, was Vaxart's largest shareholder.  Armistice's founder and

12   one of its managing directors are members of the Vaxart Board.

13   2.    As Vaxart's corporate fiduciaries, defendants owed Vaxart fiduciary duties of loyalty

14   and care – the highest duties known to the law.  Yet, when faced with the most devastating global

15   pandemic in 100 years, defendants chose to set aside their fiduciary obligations and instead act in

16   their own self-interest to enrich themselves.  This Complaint is the story of how they attempted to

17   pull it off.

18   3.    When it became apparent that COVID-19 was going to become a global pandemic,

19   defendants caused Vaxart to announce it would begin working on a vaccine that was based on its

20   oral vaccine platform.  As the Company's vaccine development efforts progressed, Vaxart issued a

21   series of press releases touting the Company's progress.  These press releases had a positive effect

22   on the Company's stock price.

23   4.    In late April 2020, the U.S. Department of Health and Human Services ("HHS")

24   announced a massive effort to create and produce a vaccine for COVID-19 dubbed Operation Warp

25   Speed ("OWS").  The "program will pull together private pharmaceutical companies, government

26   agencies and the military to try to cut the development time for a vaccine by as much as eight

27

28

1  months."[1]  The ultimate goal of OWS was to create a COVID-19 vaccine and produce at least three

2  hundred million doses by January 2021.

3        5.      The consequences for companies involved with OWS were substantial.  Congress has

4  allocated almost $10 billion in funding for the program and companies involved will received

5  substantial funding for their efforts to develop or manufacture a vaccine.[2]  Defendants, however, saw

6  an opportunity to enrich themselves.

7        6.      On June 26, 2020, defendants caused Vaxart to issue a press release claiming that a

8  vaccine the Company was working on was selected to be part of OWS.  This news caused the price

9  of Vaxart stock to soar.  The surprise announcement that Vaxart's vaccine would be part of OWS

10  more than doubled the Company's stock price to $8.04 per share on June 26, 2020.  The Company's

11  stock price was trading at $0.36 per share in January and had risen to $3.19 per share by June 24,

12  2020.

13        7.      By June 26, 2020, however, defendants had already thrown their fiduciary duties out

14  the window in an effort to enrich themselves.  On July 25, 2020, *The New York Times* published an

15  article entitled "Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine" that exposed

16  defendants' self-dealing.  The *Times* explained that the Company's biggest shareholder, Armistice,

17  owned warrants that gave it the right to purchase 21 million shares of Vaxart stock at prices between

18  $0.30 - $1.10 per share.  Armistice's founder and one of its managing directors sit on the Vaxart

19  Board.  According to the *Times* article, on June 8, 2020, just prior to the Company's press release

20  regarding OWS, defendants changed the terms of Armistice's warrants in order to make "it easier for

21  the hedge fund to rapidly acquire the 21 million shares, rather than having to buy and sell in smaller

22  batches."  Further, less than two weeks before this announcement, on June 15, 2020, the Company

23  granted stock options to purchase over 1.7 million shares of Company stock with a strike price of

24  $2.46 to its Chief Executive Officer, defendant Andrei Floroiu.

25  ---

[1]      *See* Jennifer Jacobs & Drew Armstrong, *Trump's 'Operation Warp Speed' Aims to Rush*
26  *Coronavirus Vaccine*, Bloomberg (Apr. 29, 2020), https://www.bloomberg.com/news/articles/2020-04-29/trump-s-operation-warp-speed-aims-to-rush-coronavirus-vaccine.

27  [2]      *See Fact Sheet: Explaining Operation Warp Speed*, HHS (June 16, 2020), https://
28  www.hhs.gov/about/news/2020/06/16/fact-sheet-explaining-operation-warp-speed.html.

8.      According to the *Times*, immediately upon the Company's June 26, 2020 announcement that its vaccine candidate was included in OWS, Armistice took quick advantage of the "stock's exponential increase" by exercising its warrants and purchasing Vaxart stock much more quickly that it would have been able to do without the modified terms.  Armistice made a profit of more than $197 million.  Defendant Floroiu's stock options "were worth about $4.3 million" when granted but were now "worth more than $28 million. . . .  Vaxart's board members also received large grants of stock options, giving them the right to buy shares in the company at prices well below where the stock is now trading."

9.      These well-timed stock option grants and the warrant changes are an illegal use of inside information termed spring-loading and are a breach of defendants' fiduciary duties.  *See In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 576 n.16 (Del. Ch. 2007).  Worse yet, it turns out that the Company's vaccine is ***not*** part of OWS.  Rather, its "vaccine candidate was included in a trial on primates that a federal agency was organizing in conjunction with OWS," but the Company "is not among the companies selected to receive significant financial support from Warp Speed."  Defendants' fiduciary failures have now subjected the Company to a complex and expensive-to-defend securities class action alleging violations of federal securities laws.

10.     Although Vaxart has been severely injured, defendants have not fared nearly so badly.  On the contrary, defendants have collectively pocketed millions of dollars in fees, salary, incentive-based compensation payments and other benefits that were not justified in light of Vaxart's performance while under their stewardship.  These payments wasted valuable corporate assets and unjustly enriched defendants.

11.     Despite the above, the Board has not and will not take any legal action against the defendants.  Every member of the Board was involved in the wrongdoing, has received substantial benefits from their involvement, and faces a substantial risk of liability in connection with the actions described herein.  Accordingly, by this action, plaintiff seeks to vindicate Vaxart's interests against these wayward fiduciaries.

**INTRADISTRICT ASSIGNMENT**

12.     A substantial part of the events or omissions which give rise to the claims in this action occurred in the county of San Mateo, and as such this action is properly assigned to the San Francisco or Oakland division of this Court.

**JURISDICTION AND VENUE**

13.     Pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

14.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper under 28 U.S.C. §1391(a) because Vaxart maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

16.     Plaintiff David Stachowski is a current Vaxart shareholder and has continuously held Vaxart shares since January 2018.

**Nominal Defendant**

17.     Nominal defendant Vaxart is a Delaware corporation headquartered at 385 Oyster Point Boulevard, Suite 9A, South San Francisco, CA 94080.

**Defendants**

18.     Defendant Steven J. Boyd has been a Vaxart director since October 2019.  Boyd has also been the Chief Investment Officer of Armistice since 2012 as well as its Managing Member, founder, principal and owner.

19.     Defendant Todd C. Davis has been a Vaxart director since October 2019.  Davis is chairman of Vaxart's Compensation Committee and a member of Vaxart's Nominating and Governance Committee.

20.     Defendant Michael J. Finney has been a Vaxart director since July 2007.  From 2009 until 2011, Finney served as Chief Executive Officer ("CEO") of Vaxart.  Finney is a member of Vaxart's Audit Committee.

21.     Defendant Andrei Floroiu has been a Vaxart director since April 2020 and was appointed CEO of Vaxart in June 2020.

22.     Defendant Wouter W. Latour has been a Vaxart director since October 2011 and has been Chairman of the Board since December 2019.  Latour was Vaxart's CEO from September 2011 to June 2020.

23.     Defendant Keith Maher has been a Vaxart director since October 2019 and is a member of Vaxart's Compensation Committee.  Maher has been Armistice's Managing Director since 2019.

24.     Defendant Robert A. Yedid has been a Vaxart director since October 2019.  Yedid is a member of Vaxart's Audit Committee and is the chairman of the Nominating and Governance Committee.

25.     The defendants named in ¶¶18-24 are referenced herein as the "Individual Defendants."

26.     Defendant Armistice Capital, LLC is a hedge fund incorporated in Delaware.  Armistice, through its investment in Vaxart and the participation of its senior executives on Vaxart's Board, has conducted business in California.  Prior to June 8, 2020, Armistice owned over 30% of Vaxart's outstanding shares.

## DEFENDANTS' FIDUCIARY DUTIES

27.     By reason of their positions as officers, directors, and/or fiduciaries of Vaxart and because of their ability to control the business and corporate affairs of Vaxart and its subsidiaries, the Individual Defendants owed Vaxart and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Vaxart and

its subsidiaries in a honest, lawful, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Vaxart and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Vaxart and its shareholders the fiduciary duty to exercise good faith and loyal and reasonable supervision over the Company's management, policies, practices and internal controls, as well as diligence in the administration of the affairs of the Company and its subsidiaries and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Vaxart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Vaxart, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

29.   To discharge their duties, the officers and directors of Vaxart were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Vaxart were required to, among other things:

(a)   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c)   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

30.     The Company's Code of Conduct (the "Code") applies to each of the Individual Defendants.  As Vaxart's directors and officers, the Individual Defendants' fiduciary duties required them to, among other things: (i) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of legal authority and disseminating truthful and accurate statements to the investing public; (ii) use fair dealing when conducting the affairs of the Company; (iii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and internal controls; (iv) ensure that Vaxart was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations, including the federal securities laws and state corporation laws; and (v) refrain from breaching their duty of loyalty to the Company by adopting practices and procedures and controls inconsistent with their duty of legal compliance.

31.     Specifically, the Code requires:

Vaxart, Inc. (the "Company") is committed to being a good corporate citizen and conducting its business affairs in an honest and ethical manner, and therefore requires all of its employees, directors, representatives and agents to follow a code of conduct (the "Code"). In addition, having such a code is a requirement for the NASDAQ Stock Market where the Company's shares are listed. This commitment cannot be achieved unless you, as an employee, director or representative of the Company, individually accept your responsibility to promote and demonstrate integrity and a high level of ethical conduct in all of your activities.  Activities that may reasonably be expected to call into question, or negatively impact, the Company's reputation or integrity should be avoided.  The Company expects all of its employees, directors, representatives and agents to follow the spirit of this Code, obey applicable laws, exercise good judgment, act ethically, and in general, do the "right" thing.

*       *       *

Every manager and supervisor is expected to take necessary actions to ensure compliance with this Code, to provide guidance and assist employees in resolving questions concerning the Code, and to permit employees to express any concerns regarding compliance with this Code. No director or employee has the authority to order another employee to act contrary to this Code or the law.

32.     The Code also requires all employees and directors to comply with all applicable laws and regulations and to file full, fair, accurate, timely and understandable disclosures:

**Compliance with Laws and Regulations**

The Company seeks to comply with both the letter and spirit of the applicable laws and regulations in all countries in which it operates.

The Company is committed to complying with the laws and regulations of the countries in which it operates its business. You are expected to comply with all applicable laws, rules and regulations in performing your duties on behalf of the Company. Many national, state and local laws and regulations define and establish obligations with which the Company, its employees, representatives and agents are expected to comply. Under certain circumstances, national or local law may establish requirements that differ from this Code. You are expected to comply with all local laws in conducting the Company's business. If you violate these laws or regulations in performing your duties on behalf of the Company, you not only risk individual consequences, prosecution, civil actions and penalties, you may also subject the Company to the same or a different set of risks and penalties. If you violate laws in performing your duties for the Company, you may be subject to immediate disciplinary action, including possible termination of your employment or affiliation with the Company.

*        *        *

**Full, Fair, Accurate, Timely and Understandable Disclosure**

It is of critical importance to the Company that all disclosure in reports and documents that it files with, or submits to, the U.S. Securities and Exchange Commission ("SEC"), and in other public communications made by the Company, is full, fair, accurate, timely and understandable. You are expected to take all steps available to assist the Company in fulfilling these responsibilities consistent with your role within the Company. In particular, you are required to provide prompt and accurate answers to all reasonable inquiries made to you in connection with the Company's preparation of its public reports and disclosure.

The Company's Chief Executive Officer ("CEO") and CFO and Chief Accounting Officer ("CAO") are responsible for designing, establishing, maintaining, reviewing and evaluating the effectiveness of the Company's disclosure controls and procedures on a quarterly basis, (as such term is defined by applicable SEC rules) and for taking all steps necessary or advisable to ensure that all disclosure in reports and documents filed with or submitted to the SEC, and all disclosure in other public communication made by the Company, is full, fair, accurate, timely and understandable. The Company's CEO, CFO and CAO rely on the Disclosure Committee to assist them in discharging these responsibilities.

The CEO, CFO and CAO are also responsible for establishing and maintaining adequate internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles ("GAAP"). The Disclosure Committee also assists them in this regard, and undertakes steps necessary to maintain compliance with established accounting procedures, the Company's system of internal controls, and GAAP. The Disclosure Committee's role is to ensure that the Company makes and keeps books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and disposition of the assets of the Company.

> Any involvement or collusion to conceal, misrepresent, conduct gross negligence or fraud related to the Company's accounting records or financial statements will not be tolerated and will result in disciplinary action, up to and including termination of employment or affiliation with the Company.

33.     Additionally, the Code specifically prohibits insider trading on the basis of material non-public confidential information:

**Insider Trading**

> You should never trade securities on the basis of material, non-public confidential information acquired through your employment or fiduciary relationship with the Company.

> You are prohibited under both U.S. Federal law and Company policy from purchasing or selling Company stock, directly or indirectly, on the basis of material non-public information concerning the Company. As such, the Company has adopted an Insider Trading Policy, which directors and employees should have received or have had an opportunity to review, a copy of which is available from the Company's CFO or Human Resources. Any person possessing material non-public information about the Company must not engage in transactions involving Company securities until this information has been sufficiently disseminated to the public. Generally, material information is that which would be expected to affect the investment decision of a reasonable investor or the market price of the Company's stock. You are expected to also refrain from trading in the stock of other publicly-held companies, such as existing or potential customers or suppliers, on the basis of material confidential information about them obtained by you in the course of your employment or service as a director.  It is also illegal to recommend a stock (*i.e.*, "tip") to someone else on the basis of material non-public information. If you have a question concerning the appropriateness or legality of a particular securities transaction, please consult with the Company's CFO or Human Resources.

34.     The Individual Defendants are required by the Code to avoid situations where their personal interests may conflict or appear to conflict with the Company's business interests.  The Code explains that the Individual Defendants each owe a duty of loyalty to the Company and explains circumstances that might create such a conflict.  The Code explains, among other things:

**Conflicts of Interest and Corporate Opportunities**

> You are expected to avoid any situation in which your personal interests may conflict or appear to conflict with the Company's business interests. You owe a duty of loyalty to the Company to not compromise its legitimate business interests and not to advance such interests when the opportunity to do so arises in the course of your employment.

> *        *        *

The following are some examples of actual or potential conflicts of interest:

- you, or a member of your family, receive improper personal benefits as a result of your position in the Company;

- you use Company's property for your personal use or benefit, or the benefit of your family or friends; [and]

- you engage in activities that may compromise your duty of loyalty to the Company or your ability to perform your related duties or responsibilities effectively.

35. Pursuant to the terms of the Audit Committee Charter, the defendants on the Audit Committee were responsible for, *inter alia*, assisting the Board with oversight of the integrity of Vaxart's financial statements, including the financial reporting and disclosure processes and the integrity and effectiveness of the Company's system of internal control over financial reporting; assisting the Board with oversight of compliance with legal and regulatory requirements, including those that may have a material impact on the Company's financial statements; and monitoring the Company's disclosure controls and procedures and compliance with ethical standards.

36. The Audit Committee Charter of the Vaxart Board confirms the fiduciary responsibility of the directors, providing, in relevant part, as follows:

**Purpose, Duties and Responsibilities**.

The purpose of the Committee is to oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements. Consistent with this purpose, the Committee should encourage continuous improvement of, and should foster adherence to, the Company's policies, procedures and practices at all levels and should provide an open avenue of communication among the independent auditor, financial and executive management team, the Company's internal auditor function, if applicable, (the "internal auditor") and the Board. The duties and responsibilities of the Committee include the following:

a. **Financial Statement and Disclosure Matters**

i. Meet to review and discuss with management and the independent auditor the annual audited financial statements, including the disclosures to be made in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of the Company's Form 10-K, and the form of audit opinion to be issued by the independent auditors on the financial statements, and recommend to the Board the inclusion of audited financial statements in the Company's Form 10-K.

ii. Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of each Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements and the disclosures to be made in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of the Forms 10-Q.

iii.     Discuss with management and the independent auditor significant financial reporting and disclosures, including the basis of accounting treatment made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles.

iv.     Review and discuss with management (including the internal auditor) and the independent auditor the adequacy and effectiveness of the Company's internal controls and the adequacy of disclosures about changes in internal control over financial reporting.  Review and discuss with management the adequacy and effectiveness of the Company's disclosure controls and procedures.  Consider with management, the internal auditor and the independent auditor, as appropriate, whether any changes to the Company's internal controls or disclosure controls and procedures are appropriate in light of their evaluations of the adequacy and effectiveness of such internal controls and such disclosure controls and procedures.  Review any remedial measures proposed by management in response to any identified (a) significant deficiencies or material weaknesses in the design or operation of internal controls or material weaknesses therein, (b) fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal controls, or (c) significant deficiency in the adequacy or effectiveness of the Company's disclosure controls and procedures.

v.      Review and discuss with management (including the internal auditor) and the independent auditor management's annual report on internal control over financial reporting and the independent auditor's attestation report on the Company's internal control over financial reporting prior to the filing of the Company's Form 10-K.

vi.     Review and discuss with the independent auditors:

A.      all critical accounting policies and practices used by the Company;

B.      all alternative treatments of financial transactions within U.S. generally accepted accounting principles ("GAAP") that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor;

C.      any problems or difficulties encountered in the course of the audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management;

D.      any accounting adjustments that were proposed by the independent auditor but were "passed;"

E.      any "management" or "internal control" letter or schedule of unadjusted differences issued or proposed to be issued by the independent auditor to the Company; and

F.      other material written communications provided by the independent auditor to the Company's management.

vii.    Discuss with management the Company's quarterly press releases, as well as financial information, earnings guidance and other disclosures, if any, provided to analysts and rating agencies, in each case, prior to their release.

viii.    Discuss with management and the independent auditor the effect of new or revised regulatory and accounting policies as well as off-balance sheet structures on the Company's financial statements, if any.

ix.    Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

x.    Discuss with management the Company's guidelines and policies to govern the process by which risk assessment and management is undertaken and handled.

xi.    Review and discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61, as it may be modified or supplemented.

xii.    Review disclosures made to the Committee by the Company's chief executive officer and chief accounting officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal controls.

*          *          *

**d.    Compliance Oversight Responsibilities**

i.    Obtain from the independent auditor assurance that Section 10A(b) of the Exchange Act has not been implicated.

ii.    Consider and present to the Board for adoption a Code of Conduct for all employees and directors, which meets the requirements of Item 406 of the Commission's Regulation S-K, and provide for review and prompt disclosure to the public of any change in, or waiver of, the Code of Conduct. Review such Code of Conduct at least annually and recommend such changes to the Code of Conduct as the Committee shall deem appropriate, and adopt procedures for monitoring and enforcing compliance with the Code of Conduct.

iii.    Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Conduct. As requested by the Board, review and investigate conduct alleged by the Board to be in violation of the Company's Code of Conduct, and adopt, as necessary or appropriate, remedial, disciplinary, or other measures with respect to such conduct.

iv.    Request periodic reports from the Company's legal counsel on the state of the ethics and compliance matters.

v.    Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting transactions, financial reporting and disclosures, fraud, internal controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting, ethical, and auditing matters, including the communication of such matters to the Committee.

vi.   Discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

vii.   Discuss with the Company's legal counsel any matters that may have a material impact on the financial statements or the Company's compliance policies and internal controls, including corporate securities trading policies.

viii.   Review and consider the approval or ratification of related-party transactions in accordance with the Company's policies and procedures with respect to related party transactions.

ix.   Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

x.   Review and update this Charter at least annually, or as conditions or circumstances dictate, and shall present the results of this evaluation to the Board.

xi.   Perform an annual self-assessment of the Committee's performance, including its processes and communications with management, the independent auditor and the Board, and shall present the results of this evaluation to the Board.

37.   Pursuant to the terms of the Compensation Committee Charter, the defendants on the Compensation Committee were responsible for, *inter alia*, assisting the Board in discharging its responsibilities relating to compensation of the Company's §16 officers.   The Compensation Committee Charter of the Vaxart Board confirms the fiduciary responsibility of the directors, providing, in relevant part, as follows:

**Purpose, Duties and Responsibilities**.

The purpose of the Committee is to assist the Board in discharging its responsibilities relating to compensation of the Company's Section 16 officers (as defined in Rule 16a-1(f) issued under the Exchange Act); to review Company strategies for attracting, developing, retaining and motivating management and employees; and to oversee the succession of leadership talent for the Company. The duties and responsibilities of the Committee include the following:

a.   Periodically review and approve an executive compensation policy that (i) supports the Company's overall business strategy and objectives; (ii) attracts and retains key executives; (iii) links compensation with business objectives and organizational performance; and (iv) provides competitive compensation opportunities;

b.   Review and make recommendations to the Board with respect to compensation for the Company's Chief Executive Officer ("CEO"), including relevant goals and objectives and the evaluation of the CEO's performance and compensation in light of those goals and objectives. In evaluating and determining CEO compensation, the Committee shall consider the results of the most recent stockholder advisory vote on executive compensation required by Section 14A of the Exchange Act (the "Say on Pay Vote");

c.     Review and approve corporate and other performance goals and objectives relevant to the compensation of all Section 16 officers, and make recommendations to the Board regarding officers' total compensation (including but not limited to salary, bonus, incentive compensation, equity awards, benefits and perquisites);

d.     Review and approve compensation for the Company's Section 16 officers, other than the CEO, and review their evaluations. In reviewing and approving such compensation for Section 16 officers, the Committee shall consider the results of the most recent Say on Pay Vote;

e.     Review and approve any employment agreements or arrangements with executive officers of the Company, including with respect to any perquisites and other personal benefits to the Company's executive officers;

f.     Review and make recommendations to the Board with respect to the adoption of equity-based compensation, incentive compensation and other employee benefit plans that are subject to Board approval. In reviewing and making such recommendations to the Board, the Committee shall consider the results of the most recent Say on Pay Vote;

g.     (i) Act on behalf of the Board in administering equity-based compensation, incentive compensation and other employee benefit plans approved by the Board and/or shareholders in a manner consistent with the terms of such plans, unless otherwise specified by the Board or by the terms of the plan or as delegated by the Committee, and (ii) in that administrative capacity, discharge any responsibilities imposed on the Committee under those plans, including making and authorizing grants, establishing performance goals for the relevant period and determining whether performance goals have been achieved at the end of the period;

h.     Review the compensation of non-executive directors for service on the Board and its committees and recommend changes to the Board as appropriate;

i.     Oversee the management succession process for the CEO and selected senior executives;

j.     Consult with and advise management on major policies affecting employee relations;

k.     Oversee the actions of any person or group to whom it delegates its authority;

l.     Review and discuss the disclosures in the Company's "Compensation Discussion and Analysis" with management and, based on such review and discussions, make a recommendation to the Board as to the inclusion of the "Compensation Discussion and Analysis" in the Company's annual proxy statement or Form 10-K, as applicable;

m.     Produce a Committee report for inclusion in the Company's annual proxy statement or Form 10-K, as applicable, in accordance with applicable rules and regulations;

n.     To review and recommend to the Board for approval the frequency with which the Company will conduct Say on Pay Votes, taking into account the results of the most recent stockholder advisory vote on frequency of Say on Pay Votes required by Section 14A of the Exchange Act, and review and approve the proposals

1
2
regarding the Say on Pay Vote and the frequency of the Say on Pay Vote to be included in the Company's proxy statement.

3
4
o.      To review the Company's incentive compensation arrangements to determine whether they encourage excessive risk-taking, to review and discuss at least annually the relationship between risk management policies and practices and compensation, and to evaluate compensation policies and practices that could mitigate any such risk.

5
6
p.      Annually evaluate the performance of the Committee and the adequacy of the Committee's charter; and

7
q.      Perform such other duties and responsibilities as are consistent with the purpose of the Committee and as the Board or the Committee deems appropriate.

8
**SUBSTANTIVE ALLEGATIONS**

9
10
11
12
13
14
38.      Vaxart is a clinical-stage biotechnology company primarily focused on the development of oral recombinant vaccines based on its proprietary oral vaccine platform.  According to public filings, Vaxart is developing prophylactic vaccine candidates that target a range of infectious diseases, including: COVID-19; norovirus; seasonal influenza; and respiratory syncytial virus, or RSV, a common cause of respiratory tract infections.  Vaxart has never brought a drug or vaccine successfully to market.

15
16
17
18
19
20
39.      As the world has come to grips with the COVID-19 pandemic and its resultant trail of medical and social devastation, defendants saw an opportunity to enrich themselves by granting themselves stock and/or stock options and accelerating the time period in which Armistice could exercise warrants to purchase Company stock, and then artificially inflating Vaxart's stock price with a series of materially false and misleading statements regarding the Company's work on a COVID-19 vaccine and their involvement in OWS.[3]

21
**Defendants' Statements During the Relevant Period**

22
23
24
40.      On January 2, 2020, Vaxart shares traded at $0.36 per share.  However, on January 31, 2020, defendants caused the Company to issue a press release entitled "Vaxart Announces Initiation of Coronavirus Vaccine Program."  The press release stated that the Company "has

25

---

26
27
28
[3]      OWS was announced in April 2020, and is a government effort to produce a viable COVID-19 vaccine and at least 300 million doses of such vaccine by January 2021.  *See* Jennifer Jacobs & Drew Armstrong, Trump's 'Operation Warp Speed" Aims to Rush Coronavirus Vaccine, *Bloomberg*, (Apr. 29, 2020, 11:08 AM) https://www.bloomberg.com/news/articles/2020-04-29/trump-s-operation-warp-speed-aims-to-rush-coronavirus-vaccine.

1  initiated a program to develop a coronavirus vaccine candidate based on its proprietary oral vaccine

2  platform, VAAST." According to the release, "Vaxart plans to generate vaccine candidates based on

3  the published genome of the 2019 Novel Coronavirus (2019-CoV) and evaluate them in preclinical

4  models for their ability to generate both mucosal and systemic immune responses." Specifically, the

5  release claimed:

6      Vaxart Announces Initiation of Coronavirus Vaccine Program

7                          *      *      *

8      Oral Vaccines based on Proprietary VAAST™ Platform Offer Potential Key
       Advantages in Global Quest to Develop Coronavirus Vaccine

9

10     . . . Vaxart, Inc. (NasdaqGS: VXRT), a clinical-stage biotechnology company
       developing oral recombinant vaccines administered by tablet rather than by injection,
       announced today that it has initiated a program to develop a coronavirus vaccine
11     candidate based on its proprietary oral vaccine platform, VAAST.

12     "Vaxart's proprietary technology has been clinically proven in humans, and
       the ability to make an oral vaccine to meet this current public health threat is very
13     important to all of us at Vaxart," said Sean Tucker, Ph.D., chief scientific officer of
       Vaxart. "The results of our recently published influenza challenge study
14     demonstrated that our oral tablet vaccine primarily protects through mucosal
       immunity, a potential key factor when targeting mucosal pathogens such as this new
15     coronavirus."

16     Under the program, Vaxart plans to generate vaccine candidates based on the
       published genome of the 2019 Novel Coronavirus (2019-nCoV) and evaluate them in
17     preclinical models for their ability to generate both mucosal and systemic immune
       responses. Of particular interest will be the mucosal immune responses, as
18     coronavirus is primarily an infection of the respiratory tract.

19     To date, Vaxart has conducted multiple clinical trials with vaccines based on
       its VAAST platform, demonstrating its oral tablet vaccines consistently generate
20     robust mucosal responses in humans. In addition, Vaxart's vaccines have
       demonstrated efficacy in humans for H1 influenza, and in pre-clinical models for
21     chikungunya, aerosolized Venezuelan Equine Encephalitis (VEE) and Respiratory
       Syncytial Virus (RSV).

22
       "We believe our oral tablet vaccines provide substantial potential advantages,
23     especially when targeting mucosal pathogens such as flu, norovirus, RSV and the
       recently emerged coronavirus," said Wouter Latour, MBA, MD. "In addition, the
24     logistical advantages of an oral vaccine that is administered using a convenient room
       temperature-stable tablet could be of critical benefit when rolling out a major public
25     health vaccination campaign."

26     41.    On this news, the Company's stock price began to rise. Throughout early 2020,

27 defendants caused the Company to issue a series of press releases with positive statements about its

28 vaccine prospects.

42.     For example, on March 18, 2020, defendants caused the Company to issue a press release entitled "Vaxart Announces It Entered Into an Agreement with Emergent Biosolutions for the Development and Manufacturing of Oral Coronavirus (COVID-19) Vaccine Candidate." According to this press release, the Company had entered into an agreement whereby Emergent Biosolutions would "deploy its molecule-to-market contract development and manufacturing (CDMO) services to help develop and manufacture Vaxart's experimental oral vaccine candidate for coronavirus disease (COVID-19)." The press release further stated in relevant part:

VAXART ANNOUNCES IT ENTERED INTO AN AGREEMENT WITH EMERGENT BIOSOLUTIONS FOR THE DEVELOPMENT AND MANUFACTURING OF ORAL CORONAVIRUS (COVID-19) VACCINE CANDIDATE:

*     *     *

Oral Vaccines based on Proprietary VAAST™ Platform Offer Potential Key Advantages in Global Quest to Develop Coronavirus Vaccine

. . . Vaxart, Inc. (Nasdaq: VXRT), a clinical-stage biotechnology company developing oral recombinant vaccines administered by tablet rather than by injection, announced today that it has entered into an agreement with Emergent BioSolutions Inc. (NYSE: EBS), whereby Emergent will deploy its molecule-to-market contract development and manufacturing (CDMO) services to help develop and manufacture Vaxart's experimental oral vaccine candidate for coronavirus disease (COVID-19). Vaxart's oral recombinant vaccine candidate is based on its proprietary VAAST™ platform.

"I'm pleased that we are joining forces with an experienced manufacturer such as Emergent to help advance our oral COVID-19 vaccine to the clinic," said Wouter Latour, MD, chief executive officer of Vaxart. "We believe an oral vaccine administered using a room temperature-stable tablet may offer enormous logistical advantages in the roll-out of a large vaccination campaign, and Emergent is a great partner to help in this endeavor."

Under the terms of the agreement, development services will begin immediately, and upon Vaxart's election, Emergent is expected to produce bulk cGMP vaccine allowing Vaxart to initiate a Phase 1 clinical study early in the second half of 2020. Emergent will provide development services out of its Gaithersburg, MD location and manufacture drug substance at its Bayview facility in Baltimore, MD, designated a Center for Innovation in Advanced Development and Manufacturing (CIADM) by the U.S. Department of Health and Human Services.

"Emergent is pleased to deploy our nimble CDMO expertise to support fellow innovators, like Vaxart, and advance an experimental COVID-19 vaccine candidate," said Syed T. Husain, senior vice president and CDMO business unit head at Emergent BioSolutions. "We look forward to applying our broad molecule-to-market services, including our ability to work with a multitude of delivery systems, execute under expedited timelines, and meet Vaxart's potential need for future scalability and large-scale capacity for commercial quantities."

43.     Similarly, on March 31, 2020, defendants caused the Company to issue a press release describing continued success with the Company's pre-clinical vaccine efforts.  This press release explained that development services with Emergent BioSolutions had begun:

Vaxart Provides Update on its Oral COVID-19 Vaccine Program:

*     *     *

Five COVID-19 Vaccine Candidates in Preclinical Testing

Development Services to Enable Manufacture of cGMP Vaccine at Emergent BioSolutions have Started

. . . Vaxart, Inc., a clinical-stage biotechnology company developing oral recombinant vaccines that are administered by tablet rather than by injection, today announced it had produced five COVID-19 vaccine candidates for testing in its preclinical models.  Each of the COVID-19 vaccine constructs is based on a different coronavirus antigen combination, and Vaxart expects to advance the best performing vaccine to manufacturing for clinical trials.

"The effectiveness of Vaxart's oral vaccine technology has been demonstrated in clinical trials.  Developing a vaccine to meet this current public health threat is very important to all of us at Vaxart," said Sean Tucker, Ph.D., chief scientific officer of Vaxart. "Our scientists have been working tirelessly to develop these 5 different vaccine constructs, and this evaluation in our preclinical models will allow us to select the most potent candidate for clinical testing."

In January, Vaxart initiated a program to develop a COVID-19 vaccine based on its VAAST™ platform.  On March 18, Vaxart announced that it had entered into an agreement with Emergent BioSolutions Inc. ("Emergent") for development services in preparation for the cGMP production of the Vaxart vaccine. Development services have started and, if Vaxart elects to proceed with cGMP manufacturing, Emergent is expected to produce bulk cGMP vaccine for use in a Phase 1 clinical study that Vaxart currently expects to initiate early in the second half of 2020.

"We believe an oral vaccine administered using a room temperature-stable tablet would provide enormous logistical advantages in large vaccination campaigns," said Wouter Latour, MD, chief executive officer of Vaxart Inc. "Perhaps more importantly, we recently demonstrated that our oral H1 influenza vaccine protects against respiratory infection based on mucosal immunity, the first line of defense for "mucosal" viruses like influenza and this new coronavirus.  We believe this puts Vaxart in a unique position to develop an effective vaccine that protects the population from COVID-19."

44.     On April 21, 2020, defendants cause the Company to issue a press release, entitled "Vaxart Announces Positive Pre-Clinical Data for its Oral COVID-19 Vaccine Program," explaining that the Company has "obtained positive pre-clinical results for its COVID-19 vaccine candidates,

with several of the vaccine candidates generating immune responses in all tested animals after a single dose."  Specifically, the release explained:

**Lead Vaccine Candidates Generate Anti-SARS CoV-2 Antibodies in All Tested Animals after First Dose**

. . . Vaxart, Inc., a clinical-stage biotechnology company developing oral recombinant vaccines that are administered by tablet rather than by injection, today announced that it has obtained positive pre-clinical results for its COVID-19 vaccine candidates, with several of the vaccine candidates generating immune responses in all tested animals after a single dose.

"These early pre-clinical results are in line with those for our oral influenza vaccine which was protective in a clinical Phase 2 efficacy study," said Sean Tucker, Ph.D., chief scientific officer of Vaxart.  "Additional data will inform us on which candidate we will move forward into clinical trials.  We are particularly interested in vaccine candidates that can generate mucosal immune responses in addition to serum antibody responses.  That is a key feature of our oral vaccines and potentially significant for protection against SARS CoV-2, the virus that causes COVID-19."

In January 2020, Vaxart initiated a program to develop a COVID-19 vaccine based on its VAAST™ oral vaccines platform.  The Company is currently evaluating multiple vaccine candidates in its preclinical models. In this first round of preclinical testing, all animals that received one of the Vaxart vaccines had IgG anti-SARS CoV-2 antibodies in serum two weeks after the first vaccination.  Antibody responses in all vaccinated groups were statistically significant compared to the untreated controls.  Vaxart plans to select one or more vaccine candidates for cGMP manufacturing and clinical testing based on the magnitude and the breadth of the immune response.

On March 18, 2020, Vaxart entered into an agreement with Emergent BioSolutions Inc. ("Emergent") for development services to prepare for cGMP production of an oral COVID-19 vaccine.  The first stage of the collaboration is underway and, provided Vaxart elects to proceed with cGMP manufacturing, Emergent is expected to produce bulk cGMP vaccine in time to allow the initiation of a Phase 1 clinical study during the second half of 2020.

"These results are extremely encouraging, and we should be in a position to select a lead development candidate for cGMP manufacturing and clinical testing in the coming weeks," said Wouter Latour, MD, chief executive officer of Vaxart Inc.  "Our oral vaccines have been shown to protect against respiratory infection based on mucosal immunity, the first line of defense for such infections, as recently published in the *Lancet Infectious Diseases*.  This could be important for an effective vaccine that protects the global population from COVID-19.  In addition, the Vaxart vaccine would be administered orally using a room temperature-stable tablet, an enormous logistical advantage over injectables in large vaccination campaigns."

45.     By April 27, 2020, buoyed by defendants positive statements regarding the Company's progress on its COVID-19 vaccine, Vaxart stock was trading at $3.66 per share.  The Company continued to issue positive statements regarding its COVID-19 vaccine development throughout April and May 2020.

46.     On April 30, 2020, defendants caused the Company to issue a press release further touting the Company's progress on its COVID-19 vaccine development.  The press release claimed:

**Vaxart Announces Additional Positive Pre-Clinical Data for its Oral COVID-19 Vaccine Program**

\*       \*       \*

**Robust Boosting of Immune Responses Observed after Second Dose**

. . . Vaxart, Inc., a clinical-stage biotechnology company developing oral recombinant vaccines that are administered by tablet rather than by injection, today announced that it has obtained positive pre-clinical results for its COVID-19 vaccine candidates, with several of the vaccine candidates generating immune responses in all tested animals after a single dose.

"These pre-clinical results confirm that all constructs are immunogenic as measured by IgG antibodies in serum, and we observed a robust boosting effect after the second dose," said Sean Tucker, Ph.D., chief scientific officer of Vaxart. "This latest data set will help to select the lead candidate for manufacturing, and we remain on track to start a first phase 1 study in the second half of this year."

In January 2020, Vaxart initiated a program to develop a COVID-19 vaccine based on its VAAST™ oral vaccines platform.  The Company is currently evaluating multiple vaccine candidates in its preclinical models.  In this second round of preclinical testing, all animals received two doses of the Vaxart vaccines, two weeks apart.  Antibody responses in all vaccinated groups were statistically significant compared to the untreated controls.  Vaxart plans to select one or more vaccine candidates for cGMP manufacturing and clinical testing based on the magnitude and the breadth of the immune response.

"Our oral vaccines have been shown to protect against respiratory infection based on mucosal immunity, the first line of defense for such infections, as recently published in the *Lancet Infectious Diseases*," said Wouter Latour, MD, chief executive officer of Vaxart Inc.  "This could be important for an effective vaccine that protects the global population from COVID-19.  In addition, the Vaxart vaccine would be administered orally using a room temperature-stable tablet, an enormous logistical advantage over injectables in large vaccination campaigns."

47.     Next, on May 20, 2020, defendants caused the Company to announce that it had picked its vaccine lead candidates for pre-clinical trials.  Specifically, the press release stated:

**Vaxart Announces Selection of its Oral COVID-19 Vaccine Lead Candidate**

\*       \*       \*

*KindredBio Selected as Second Contract Manufacturing Organization GMP Production for Phase 1 Study Initiated*

. . .Vaxart, Inc. ("Vaxart" or the "Company") (NASDAQ: VXRT), a clinical-stage biotechnology company developing oral recombinant vaccines that are administered by tablet rather than by injection, today announced that it has selected its lead COVID-19 vaccine candidate and has contracted with KindredBio to

manufacture bulk vaccine under cGMP to complement the manufacturing capacity of partner Emergent BioSolutions.

"All our COVID-19 vaccine constructs were highly immunogenic in preclinical testing, and we are taking the candidate forward that is expected to generate the broadest immune response in humans," said Sean Tucker, Ph.D., chief scientific officer of Vaxart. "In a phase 2 efficacy study that was recently published in the Lancet Infectious Diseases, we have demonstrated that our oral H1 flu tablet vaccine protected against influenza infection after just one dose. Based on these results, we believe our vaccines are ideal to protect against mucosal respiratory viruses such as SARS-CoV-2, the virus that causes COVID-19."

In January 2020, Vaxart initiated a program to develop a COVID-19 vaccine based on its VAAST™ oral vaccines platform. The Company evaluated multiple vaccine candidates in its preclinical models and has chosen the lead candidate for cGMP manufacturing and clinical testing based on the magnitude and the breadth of the immune response. Vaxart has contracted with Emergent BioSolutions ("Emergent") and Kindred Biosciences, Inc. ("KindredBio") to produce bulk vaccine under cGMP for upcoming clinical trials. The vaccine tablets will be manufactured at Vaxart.

"We are very pleased to have an experienced partner such as KindredBio to help us meet global demand for our COVID-19 vaccine," said Wouter Latour, MD, chief executive officer of Vaxart. "The program with Emergent BioSolutions is progressing very well, and we expect KindredBio will add additional capacity to help produce bulk vaccine. An important benefit of our platform is that our vaccines are produced in tablet form and we don't need the sterile fill and finish that is required for the production of injectable vaccines. Manufacturing of our COVID-19 vaccine is on track to start a first phase 1 study in the second half of this year, possibly as early as the summer."

48. Armistice is Vaxart's largest shareholder, and at one point in 2019 Armistice owned more than 50% of the Company's common stock. According to a May 5, 2020 Schedule 13D filed with the U.S. Securities and Exchange Commission ("SEC"), Armistice held approximately 22.5% (15.95 million shares) of Vaxart's outstanding shares. Armistice also had the right to purchase over 20 million additional shares of Vaxart stock at prices ranging from $0.30 to $1.10 per share.[4] The Armistice warrants were subject to a blocker provision that limited the ability to exercise the warrants if Armistice would be more than a 9.99% or 4.99%, respectively, beneficial owner of Vaxart shares following exercise and required Armistice to provide 60 days' notice to the Company of an increase in the beneficial ownership limitation. These limitations effectively made it difficult for Armistice to purchase shares subject to the warrants quickly.

---

[4] According to a Form-3 filed with the SEC on or around September 30, 2019, Armistice purchased warrants that allowed it to purchase up to 20,757,576 shares of Vaxart common stock for $0.30 per share (16,666,667 shares) and $1.10 per share (4,090,909 shares).

49.     However, on June 8, 2020, defendants caused the Company to modify the terms of the Armistice warrants by increasing the blocker provision to 19.99% and waiving the 60-day notice provision:

> On June 8, 2020, the Company and Armistice Capital Master Fund, Ltd. ("*Armistice*") entered into amendments (the "*Warrant Amendments*") to (i) the Common Stock Purchase Warrant, issued as of April 11, 2019, to purchase 4,090,909 shares of common stock of the Company, par value $0.10 per share ("*Common Stock*"; such warrant, the "*$1.10 Warrant*"), and (ii) the Common Stock Purchase Warrant, issued as of September 30, 2019, to purchase 16,666,667 shares of Common Stock (the "*$0.30 Warrant*"; together with the $1.10 Warrant, the "*Original Warrants*"), each of which is held by Armistice.
>
> Each of the Warrant Amendments increases the beneficial ownership limitation in those instruments from 4.99%, in the case of the $1.10 Warrant, and 9.99%, in the case of the $0.30 Warrant, to 19.99% in each. The Warrant Amendments also remove the requirement to provide 60 days' notice to the Company of an increase in the beneficial ownership limitation. All other terms of the Original Warrants will remain in full force and effect.

50.     The Company's 2020 Proxy Statement filed with the SEC explains that "[t]he Company does not have a formal policy for equity awards to non-employee directors," that "[i]n 2018, no awards were made," and that "[i]n 2019, each non-employee director . . . was awarded" 21,700 options.  However, on June 8, 2020, defendants caused the Company to issue 65,700 stock options to defendants Davis, Finney, and Yedid.  Defendants Boyd and Maher, as Armistice employees, did not receive these extraordinary option grants.

51.     Six days later, defendants caused the Company to announce that its then CEO was stepping down and that defendant Floroiu would be appointed CEO.  Defendant Floroiu, a partner at Armistice, would remain on the Vaxart Board.  Defendants announced these changes via a Form 8-K filed with the SEC, which stated:

> *Appointment of Mr. Floroiu as Chief Executive Officer*
>
> On June 15 2020, the Board of Directors of the Company (the "**Board**") announced that, effective as of June 14, 2020, a current Board member, Andrei Floroiu, 47, has been appointed as Chief Executive Officer of the Company.  Mr. Floroiu will also serve as the Company's principal financial officer.
>
> Mr. Floroiu has served as a director since April 2020 and will continue on the board while serving as Chief Executive Officer.  He is a senior advisor to the chief executive officer of Agenus Inc., a biotechnology company focused on immunotherapy including immuno-oncology, since 2015.  From 2012 to 2015, Mr. Floroiu was a Managing Director of Exigo Capital Corp., where he provided strategic, financial and operational advice to companies undergoing significant

transformational and strategic transactions. From 2010 to 2012, Mr. Floroiu served as the founder and president of Fly for MS, a charity to raise global awareness for Multiple Sclerosis. From 2004 to 2008, he served as a principal for The Invus Group, a private equity investment firm. He holds an MBA in Finance from The Wharton School, University of Pennsylvania, a Master of Science in Computer Engineering from the University of Maryland and a Bachelor of Science in Computer Engineering from the Universitatea Politehnica in Bucharest, Romania.

In connection with his appointment as Chief Executive Officer of the Company, Mr. Floroiu entered into a letter agreement with the Company, dated as of June 14, 2020 (the "*Letter Agreement*"). Pursuant to the Letter Agreement, Mr. Floroiu will hold the title of Chief Executive Officer, in addition to his current duties as a Board member until the termination of his employment by the Board or by himself. In connection with his appointment, Mr. Floroiu will receive a base salary of $400,000 per year, and will participate in the Company's Severance Benefit Plan (the "*Severance Plan*"). . . .  Effective on the date of his appointment, Mr. Floroiu resigned from his membership on the Audit Committee of the Board, of which he had served as the Chairman.

In connection with his appointment as Chief Executive Officer of the Company, Mr. Floroiu will be eligible to participate in the Company's annual bonus program. His "target" bonus opportunity will be up to 50% of his annual base salary, which will be pro-rated for the 2020 fiscal year. Any payment under the annual bonus program will be based on the extent to which certain performance objectives established by the Board have been achieved for that year, in the sole discretion of the Board. Mr. Floroiu will also be eligible to for a bonus equal to $100,000 (the "*Success Bonus*") if he remains continuously employed through the earlier of the following dates (a) the date that the Company executes a substantial strategic agreement, as determined by the Board (a "*Strategic Agreement*"), and (b) the date on which a Change in Control (as defined in the Letter Agreement) occurs (the earliest such date being the "*Vesting Date*"), in either case on or before November 30, 2020.

52.    Defendant Floroiu's elevation to the CEO position also resulted in a generous award of over 1.7 million stock option grants with over half of the granted options containing an unusually short vesting period that would allow defendant Floroiu to exercise the options prior to November 30, 2020. The stock option grant to defendant Floroiu stated, specifically:

As of June 15, 2020 (the "*Grant Date*"), the Company granted an option to purchase 845,280 shares of the Company's common stock under the Company's 2019 Equity Incentive Plan (the "*Equity Plan*") at a strike price equal to the closing price of the Company's common stock on the Grant Date (the "*Time-Based Option*"). The Time-Based Option will vest as follows: 25% on the first anniversary of the Grant Date and 75% in equal monthly installments over the three-year period commencing on such first anniversary, with accelerated vesting with respect to 50% of any then-unvested option shares upon the Company's execution of a Strategic Agreement, as determined by the Board, and with accelerated vesting in full in the event of a "Change in Control" (as defined under the Equity Plan).

As of the Grant Date, the Company also granted Mr. Floroiu an option to purchase 900,000 shares of the Company's common stock under the Equity Plan at a strike price equal to the closing price of the Company's common stock on the Grant

Date (the "***Performance-Based Option***"). The Performance-Based Option will vest as follows: (i) one-third if the Company achieves a per share closing price equal to $5.00 or more during any 10-consecutive trading days after the Grant Date but before November 30, 2020 or such later date as determined by the Board (the "***Reference Date***"), (ii) one-third if the Company achieves a per share closing price equal to $7.50 or more during any 10-consecutive trading days after the Grant Date but before the Reference Date, and (iii) one-third if the Company achieves a per share closing price equal to $10.00 or more during any 10-consecutive trading days after the Grant Date but before the Reference Date, in each case subject to continued employment. In the event a Change in Control occurs before the Reference Date, any unvested portion of the Performance-Based Option will vest in accordance with the above schedule based on the Company attaining the specified stock price immediately prior to the closing of such transaction (rather than based on a 10-consecutive trading day period).

53.    Only 11 days later, on June 25, 2020, defendants caused the Company to issue another press release explaining that the Company had signed a letter of intent with another company to help it mass-produce its potential vaccine. The press release stated, in relevant part:

**Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP**

\*        \*        \*

*Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year Through Large Scale Lyophilization, Tableting and Coating*

. . . Vaxart, Inc. ("Vaxart" or the "Company"), a clinical-stage biotechnology company developing oral vaccines that are administered by tablet rather than by injection, announced today that it signed a Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP (AMS) affirming the parties' intent to establish AMS as a resource for lyophilization development and large scale manufacturing including tableting and enteric coating for Vaxart's oral COVID-19 vaccine. AMS will be assigning dedicated resources and equipment for the scale up and commercial production of the vaccine upon entering a formal agreement.

"We believe AMS' experience coupled with its ability to manufacture a billion or more doses per year would be a beneficial addition to our group of CDMO partners and enable the large scale manufacturing and ultimate supply of our COVID-19 vaccine for the US, Europe and other countries in need," said Andrei Floroiu, CEO of Vaxart Inc. "We believe our oral vaccines, generated on our proven platform, have the potential to offer superior protection against airborne viruses such as SARS-CoV-2 by triggering both mucosal and systemic immunity while being administered by a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

54.    On this news shares of Vaxart nearly doubled from $3.19 to $6.26 per share.

55.    The next day, June 26, 2020, defendants caused the Company to announce that it had been selected for "Operation Warp Speed" – the government's effort to fast-track the creation of an effective vaccine for COVID-19. The press release stated:

**Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed**

\*       \*       \*

**OWS to Test First Oral COVID-19 Vaccine in Non-Human Primates**

. . . Vaxart, Inc., a clinical-stage biotechnology company developing oral vaccines that are administered by tablet rather than by injection, today announced that its oral COVID-19 vaccine has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021.

The study is designed to demonstrate the efficacy of Vaxart's oral COVID-19 vaccine candidate.

"We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated. SARS-CoV-2, the coronavirus that causes COVID-19, is primarily transmitted by viral particles that enter through the mucosa - nose, mouth or eyes - strongly suggesting that mucosal immunity could serve as the first line of defense," said Andrei Floroiu, Chief Executive Officer of Vaxart Inc. "In addition, our vaccine is a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

56.     On this news the price of Vaxart stock soared, reaching a high of more than $14 per share at one point and closing at over $8 per share.

57.     Armistice took advantage of the rapid increase in Vaxart's stock price by executing its warrants on Friday, June 26 and Monday June 29, 2020 to buy nearly 21 million Vaxart shares for either $0.30 or $1.10 per share.  According to Armistice's June 30, 2020 SEC filing on Form-4, it sold its Vaxart shares for prices ranging from $6.58 to $12.89 per share for more than $260 million in proceeds.

**The Truth is Revealed**

58.     On July 25, 2020, *The New York Times* published an article entitled "Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine," revealing the materially false and misleading nature of defendants' statements regarding the Company's participation in OWS and the suspicious timing of the option grants to defendant Floroiu and the changes to the warrant agreement with Armistice.  The article stated, in relevant part:

On June 26, a small South San Francisco company called Vaxart made a surprise announcement: A coronavirus vaccine it was working on had been selected by the U.S. government to be part of Operation Warp Speed, the flagship federal initiative to quickly develop drugs to combat Covid-19.

Vaxart's shares soared. Company insiders, who weeks earlier had received stock options worth a few million dollars, saw the value of those awards increase sixfold.  And a hedge fund that partly controlled the company walked away with more than $200 million in instant profits.

The race is on to develop a coronavirus vaccine, and some companies and investors are betting that the winners stand to earn vast profits from selling hundreds of millions – or even billions – of doses to a desperate public.

Across the pharmaceutical and medical industries, senior executives and board members are capitalizing on that dynamic.

They are making millions of dollars after announcing positive developments, including support from the government, in their efforts to fight Covid-19.  After such announcements, insiders from at least 11 companies – most of them smaller firms whose fortunes often hinge on the success or failure of a single drug – have sold shares worth well over $1 billion since March, according to figures compiled for The New York Times by Equilar, a data provider.

In some cases, company insiders are profiting from regularly scheduled compensation or automatic stock trades.  But in other situations, senior officials appear to be pouncing on opportunities to cash out while their stock prices are sky high.  And some companies have awarded stock options to executives shortly before market-moving announcements about their vaccine progress.

The sudden windfalls highlight the powerful financial incentives for company officials to generate positive headlines in the race for coronavirus vaccines and treatments, even if the drugs might never pan out.

Some companies are attracting government scrutiny for potentially using their associations with Operation Warp Speed as marketing ploys.

For example, the headline on Vaxart's news release declared: "Vaxart's Covid-19 Vaccine Selected for the U.S. Government's Operation Warp Speed." But the reality is more complex.

Vaxart's vaccine candidate was included in a trial on primates that a federal agency was organizing in conjunction with Operation Warp Speed.  But Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses.

"The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others.  Neither is the case with Vaxart," said Michael R. Caputo, the department's assistant secretary for public affairs.  "Vaxart's vaccine candidate was selected to participate in preliminary U.S. government studies to determine potential areas for possible Operation Warp Speed partnership and support.  At this time, those studies are ongoing, and no determinations have been made."

Some officials at the Department of Health and Human Services have grown concerned about whether companies including Vaxart are trying to inflate their stock prices by exaggerating their roles in Warp Speed, a senior Trump administration official said.  The department has relayed those concerns to the Securities and Exchange Commission, said the official, who spoke on the condition of anonymity.

It isn't clear if the commission is looking into the matter.  An S.E.C. spokeswoman declined to comment.



Andrei Floroiu, the chief executive of Vaxart, received stock options worth about $4.3 million in June. A month later, they were worth more than $28 million.  [Credit] Will Ragozzino/Patrick McMullan

"Vaxart abides by good corporate governance guidelines and policies and makes decisions in accordance with the best interests of the company and its shareholders," Vaxart's chief executive, Andrei Floroiu, said in a statement on Friday.  Referring to Operation Warp Speed, he added, "We believe that Vaxart's Covid-19 vaccine is the most exciting one in O.W.S. because it is the only oral vaccine (a pill) in O.W.S."

Well-timed stock transactions are generally legal.  But investors and corporate governance experts say they can create the appearance that executives are profiting from inside information, and could erode public confidence in the pharmaceutical industry when the world is looking to these companies to cure Covid-19.

"It is inappropriate for drug company executives to cash in on a crisis," said Ben Wakana, executive director of Patients for Affordable Drugs, a nonprofit advocacy group. "Every day, Americans wake up and make sacrifices during this pandemic.  Drug companies see this as a payday."

*        *        *

Vaxart, though, is where the most money was made the fastest.

At the start of the year, its shares were around 35 cents.  Then in late January, Vaxart began working on an orally administered coronavirus vaccine, and its shares started rising.

Vaxart's largest shareholder was a New York hedge fund, Armistice Capital, which last year acquired nearly two-thirds of the company's shares.  Two Armistice executives, including the hedge fund's founder, Steven Boyd, joined Vaxart's board

1
2
3
4
5
6
7
8
9
10
11
12

of directors.  The hedge fund also purchased rights, known as warrants, to buy 21 million more Vaxart shares at some point in the future for as little as 30 cents each.



Selling Vaxart stock made more than $197 million in profit for Armistice Capital, a hedge fund that owned two-thirds of the company's shares.   [Credit] Rafael Henrique/Getty Images

13
14
15

Vaxart has never brought a vaccine to market. It has just 15 employees. But throughout the spring, Vaxart announced positive preliminary data for its vaccine, along with a partnership with a company that could manufacture it.  By late April, with investors sensing the potential for big profits, the company's shares had reached $3.66 – a tenfold increase from January.

16
17

On June 8, Vaxart changed the terms of its warrants agreement with Armistice, making it easier for the hedge fund to rapidly acquire the 21 million shares, rather than having to buy and sell in smaller batches.

18
19

One week later, Vaxart announced that its chief executive was stepping down, though he would remain chairman.  The new C.E.O., Mr. Floroiu, had previously worked with Mr. Boyd, Armistice's founder, at the hedge fund and the consulting firm McKinsey.

20
21

On June 25, Vaxart announced that it had signed a letter of intent with another company that might help it mass-produce a coronavirus vaccine. Vaxart's shares nearly doubled that day.

22
23

The next day, Vaxart issued its news release saying it had been selected for Operation Warp Speed.  Its shares instantly doubled again, at one pointing hitting $14, their highest level in years.

24
25

"We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated," Mr. Floroiu said.

26
27

Armistice took advantage of the stock's exponential increase – at that point up more than 3,600 percent since January. On June 26, a Friday, and the next Monday, the hedge fund exercised its warrants to buy nearly 21 million Vaxart

28

shares for either 30 cents or $1.10 a share – purchases it would not have been able to make as quickly had its agreement with Vaxart not been modified weeks earlier.

Armistice then immediately sold the shares at prices from $6.58 to $12.89 a share, according to securities filings.  The hedge fund's profits were immense: more than $197 million.

"It looks like the warrants may have been reconfigured at a time when they knew good news was coming," said Robert Daines, a professor at Stanford Law School who is an expert on corporate governance.  "That's a valuable change, made right as the company's stock price was about to rise."

At the same time, the hedge fund also unloaded some of the Vaxart shares it had previously bought, notching tens of millions of dollars in additional profits.

By the end of that Monday, June 29, Armistice had sold almost all of its Vaxart shares.

Mr. Boyd and Armistice declined to comment.

Mr. Floroiu said the change to the Armistice agreement "was in the best interests of Vaxart and its stockholders" and helped it raise money to work on the Covid-19 vaccine.

He and other Vaxart board members also were positioned for big personal profits.  When he became chief executive in mid-June, Mr. Floroiu received stock options that were worth about $4.3 million. A month later, those options were worth more than $28 million.

Normally when companies issue stock options to executives, the options can't be exercised for months or years.  Because of the unusual terms and the run-up in Vaxart's stock price, most of Mr. Floroiu's can be cashed in now.

Vaxart's board members also received large grants of stock options, giving them the right to buy shares in the company at prices well below where the stock is now trading.  The higher the shares fly, the bigger the profits.

"Vaxart is disrupting the vaccine world," Mr. Floroiu boasted during a virtual investor conference on Thursday.  He added that his impression was that "it's OK to make a profit from Covid vaccines, as long as you're not profiteering."

59.    The revelations in *The New York Times* article further revealed that defendants violated federal securities laws by issuing a materially false and misleading proxy statement in 2020. On April 24, 2020, defendants caused the Company to file its 2020 Proxy Statement with the SEC on Form DEF 14A.  In the 2020 Proxy Statement defendants sought shareholder approval for, among other things: (1) re-election of each defendant (except defendant Floroiu) to the Vaxart Board; (2) an increase in the number of shares available for issuance pursuant to the 2019 Equity Incentive Plan by 6.4 million to 8 million shares total; and (3) an increase in the number of authorized shares of

1   common stock and a decrease in par value to 150 million and $0.0001, respectively.  Defendants,

2   however, knew the 2020 Proxy Statement was materially false and misleading because it failed to

3   disclose that, if shareholders approved the increase in stock available to issue pursuant to the 2019

4   Equity Incentive Plan, defendants would use material inside information regarding the prospects for

5   the Company's COVID-19 vaccine development to grant stock options prior to the release of

6   important information that would likely cause Vaxart's stock price to rapidly and substantially

7   increase, *i.e.*, spring-loading.

8        60.   Moreover, the 2020 Proxy Statement was also materially false and misleading

9   because defendants fail to disclose that spring-loading stock option grants is not allowed by the 2019

10  Equity Incentive Plan.  By granting stock options shortly before disclosing information already

11  known to defendants due to their inside information, defendants violated the terms of the 2019

12  Equity Incentive Plan that require "the exercise or strike price of each Option . . . will be not less

13  than 100% of the Fair Market Value of the Common Stock subject to the Option . . . on the date the

14  Award is granted."  By spring-loading option grants, defendants artificially lower the strike price

15  below 100% of the fair market value of the common stock as required by the plan.

16       61.   In addition, pursuant to the terms of the 2019 Equity Incentive Plan, the Board must

17  "seek to obtain from each regulatory commission or agency, as necessary, such authority as may be

18  required to grant Stock Awards and to issue and sell shares of Common Stock upon exercise or

19  vesting of the Stock Awards" pursuant to the plan.  However, defendants did not seek authorization

20  from any regulatory commission or agency to approve the issuance of spring-loaded stock options

21  based on material inside information.  Worse yet, the Company's Code of Conduct directly prohibits

22  trading Company stock based on inside information.  Thus, the 2020 Proxy Statement was materially

23  false and misleading.

24                              **DAMAGES**

25       62.   As a direct and proximate result of defendants' misconduct, Vaxart has been severely

26  damaged and injured.  Moreover, defendants' faithless acts and/or omissions have irreparably

27  damaged Vaxart's credibility, corporate image and goodwill.  For at least the foreseeable future,

28  Vaxart will suffer from what is known as the "liar's discount," a term applied to the stocks of

1    companies who have been implicated in improper behavior and have misled the investing public,

2    such that Vaxart's ability to raise equity capital or debt on favorable terms in the future is now

3    impaired.  Furthermore, as a direct and proximate result of defendants' misconduct, Vaxart has been

4    named a defendant in a class action lawsuit for violations of the federal securities laws.

5                    **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

6            63.    Plaintiff incorporates by reference and realleges each and every allegation set forth

7    herein.

8            64.    Plaintiff brings this action derivatively in the right and on behalf of Vaxart to redress

9    injuries suffered, and to be suffered, by Vaxart as a direct result of the breaches of fiduciary, aiding

10   and abetting of the breaches of fiduciary duty, unjust enrichment, and violations of §14(a) of the

11   Exchange Act by the defendants.  Vaxart is named as a nominal defendant solely in a derivative

12   capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not

13   otherwise have.

14           65.    Plaintiff will adequately and fairly represent the interests of Vaxart in enforcing and

15   prosecuting its rights.

16           66.    As of the date this Complaint was filed, the Vaxart Board consisted of eight directors:

17   defendants Boyd, Davis, Finney, Floroiu, Latour, Maher, and Yedid, and non-defendant Karen J.

18   Wilson.

19           67.    Plaintiff has not made a demand on the present Board of Vaxart to institute this action

20   because such a demand would have been a futile, wasteful and useless act, particularly for the

21   following reasons:

22           68.    Defendants Boyd, Davis, Finney, Floroiu, Latour, Maher, and Yedid served as

23   directors of the Company during some or all of the wrongdoing alleged herein, and each faces a

24   substantial likelihood of liability for their participation in the illegal acts alleged herein.  The

25   statements and actions regarding the changes to the Armistice warrants that defendants Boyd, Davis,

26   Finney, Floroiu, Latour, Maher, and Yedid caused or allowed to occur were based on inside

27   information that was unavailable to the public regarding the Company's COVID-19 vaccine

28   development prospects and its related involvement with OWS.  Defendants Boyd, Davis, Finney,

1   Floroiu, Latour, Maher, and Yedid approved the modification of the Armistice warrants to take

2   advantage of news they knew would be released shortly and would cause a substantial rise in the

3   price of Vaxart stock.  It is through these actions and statements that defendants Boyd, Maher and

4   Armistice were able to reap illegal profits when exercising the Armistice warrants.  Thus, defendants

5   Boyd, Davis, Finney, Floroiu, Latour, Maher, and Yedid, each face a substantial likelihood of

6   liability for their acts in connection with the modification of the Armistice warrants, rendering a

7   demand upon them futile.

8          69.     Demand upon defendants Boyd and Maher is futile because they engaged in self-

9   dealing in order to benefit from the change to the Armistice warrants as the founder and a managing

10  director of Armistice, respectively.  Defendants Boyd and Maher profited from the changes to the

11  Armistice warrants that allowed Armistice to purchase its warrants faster, when they (and the rest of

12  the Board) were aware of material inside information regarding the prospects for the Company's

13  COVID-19 development and its related involvement with OWS.  Thus, each of them, through their

14  positions at defendant Armistice, received much greater profits that they otherwise would have

15  because Armistice could sell more than 20 million Vaxart shares immediately upon the revelation

16  that the Company's vaccine was going to be part of OWS.  Because defendants Boyd and Maher

17  personally profited from the illegal insider trading, demand upon them is excused.

18         70.     Defendants Maher and Davis served on the Compensation Committee when

19  defendant Floroiu was hired as CEO and approved the spring-loaded grant of 900,000 stock options

20  to defendant Floroiu.  These defendants issued this spring-loaded grant based on material inside

21  information regarding the future prospects for Vaxart's COVID-19 vaccine development and its

22  related involvement with OWS.  Defendants Maher and Davis approved this grant of options to

23  defendant Floroiu to take advantage of news they knew would be released shortly and would cause a

24  substantial rise in the price of Vaxart stock.  The spring-loaded stock option grants at issue here also

25  violated the Company's 2019 Equity Incentive Plan and the Company's Code of Conduct

26  prohibiting insider trading.  Accordingly, defendants Maher and Davis face a substantial likelihood

27  of liability for violating federal and/or state law and any demand upon them is excused.

28

71.   Simply put, spring loading stock options based on material inside information is an unlawful act and is a violation of the Company's 2019 Equity Incentive Plan and the Company's Code of Conduct.  Breaking the law and/or violating federal and/or state statutes is not a legally protected business decision and such conduct is incapable of ratification because it cannot be considered a valid exercise of business judgment.  Significantly, only the Board can approve a change to the Armistice warrants and only the Board, through its Compensation Committee, can issue stock options to defendant Floroiu.  Thus, a majority of the Board knew about the illegal spring loading of the Armistice warrants and the stock option grants to defendant Floroiu.  Because a Board decision predicated on breaking the law cannot be a valid exercise of business judgment, demand upon the Board is excused.

72.   At the time the action was initiated, the principal professional occupation of defendant Floroiu was (and is) his employment with Vaxart as its CEO, pursuant to which he received substantial monetary compensation and other benefits.  In addition, defendant Floroiu is not disinterested in the outcome of this litigation as he received 900,000 spring-loaded stock options.  Any effort by defendant Floroiu to bring suit would jeopardize his spring-loaded stock options and his position at the Company.  Moreover, defendant Floroiu's spring-loaded stock option grant was approved by defendants Maher and Davis as members of the Compensation Committee.  Defendant Floroiu also lacks independence from demonstrably interested directors Maher and Davis who, as members of the Compensation Committee, granted the spring-loaded options to defendant Floroiu.  Accordingly, any demand upon defendant Floroiu is excused as futile.

73.   Plaintiff has not made any demand on Vaxart shareholders to institute this action since such demand would be a futile and useless act for the following reasons:

(a)   Vaxart is a publicly traded company with over 109 million shares outstanding and hundreds or thousands of shareholders;

(b)   Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)   Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT 3:20-cv-06525
4838-0110-3307.v1-9/18/20

**COUNT I**

**Against All Defendants for Breach of Fiduciary Duty**

74.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

75.     Defendants owe Vaxart fiduciary obligations.  By reason of their fiduciary relationships, the defendants owed and owe Vaxart the highest obligation of good faith, fair dealing, loyalty and due care and diligence in the management of the Company.

76.     Defendants each violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.  They have each also been responsible for the gross and reckless management of Vaxart and ignored their fiduciary responsibilities by causing the Company to engage in unlawful conduct described herein.  In addition, each defendant aided and abetted each other defendants' breaches of fiduciary duties.

77.     Defendants engaged in the above conduct in intentional breach of their fiduciary duties to the Company.

78.     Defendants conspired to abuse, and did abuse, their positions of control and oversight at Vaxart.

79.     As a direct and proximate result of the defendants' failures to perform their fiduciary obligations, Vaxart has sustained significant damages.  Plaintiff, as a shareholder and representative of the Company, seeks damages and other relief for the Company.

**COUNT II**

**Unjust Enrichment Against the Individual Defendants**

80.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

81.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Vaxart.

82.     Plaintiff, as a shareholder and representative of Vaxart, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits,

benefits, and other compensation obtained by said defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT III

### For Violations of §14(a) of the Exchange Act
### Against Defendants Boyd, Davis, Finney, Latour, Maher, and Yedid

83.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

84.     Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9(a).

85.     The 2020 Proxy Statement violated §14(a) and Rule 14a-9 because it solicited Vaxart shareholder votes for, *inter alia*, director re-election and executive compensation, while simultaneously misrepresenting and/or failing to disclose that: (i) defendants had not sought or received regulatory approval to grant spring-loaded stock options as required by the 2019 Equity Incentive Plan; and (ii) despite the 2019 Equity Incentive Plan requirement that "the exercise or strike price of each Option . . . will be not less than 100% of the Fair Market Value of the Common Stock subject to the Option . . . on the date the Award is granted," defendants intended to artificially lower the strike price below 100% of the fair market value of the common stock by spring loading option grants immediately prior to issuing positive, albeit false, news about the Company that was expected to cause a substantial increase in the Company's stock price.  Defendants Boyd, Davis, Finney, Latour, Maher, and Yedid issued, caused to be issued, and participated in the issuance of these materially false and misleading written statements to stockholders in the 2020 Proxy Statement.  By reasons of the conduct alleged herein, defendants Boyd, Davis, Finney, Latour, Maher, and Yedid violated §14(a) of the Exchange Act.  As a direct and proximate result of these violations, stockholders voted in favor of re-electing defendants Boyd, Davis, Finney, Latour,

Maher, and Yedid to the Board.  The re-election of defendants Boyd, Davis, Finney, Latour, Maher, and Yedid led to the continuation of the wrongful practices described herein.

86.  In the exercise of reasonable care, defendants should have known that the statements contained in the 2020 Proxy Statement were materially false and misleading, and/or that the 2020 Proxy Statement omitted material information.  The Company was damaged as a result of defendants' material misrepresentations and omissions in the 2020 Proxy Statement.

87.  Plaintiff, on behalf of Vaxart, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants Boyd, Davis, Finney, Latour, Maher, and Yedid based upon the false and misleading 2020 Proxy Statement, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.  Against defendants and in favor of the Company for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, unjust enrichment and violations of §14(a) of the Exchange Act;

B.  Directing Vaxart to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Vaxart and its shareholders from a repeat of the damaging events described herein;

C.  Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding and imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Vaxart has an effective remedy;

D.  Awarding to Vaxart restitution from defendants, and each of them, including ordering disgorgement of all profits, benefits and other compensation obtained by defendants;

E.  Awarding plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.  Granting such other and further relief as the Court deems just and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  September 21, 2020

ROBBINS GELLER RUDMAN
  & DOWD LLP
BENNY C. GOODMAN III
ERIK W. LUEDEKE


*s/ Benny C. Goodman III*
BENNY C. GOODMAN III

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
bennyg@rgrdlaw.com
eluedeke@rgrdlaw.com

BARR LAW GROUP
LEONID KANDINOV
501 West Broadway, Suite 800
San Diego, CA  92101
Telephone:  619/400-4966
619/400-4810 (fax)
leo@barrlaw.com

Attorneys for Plaintiff

## VERIFICATION

I, David Stachowski, hereby verify that I am familiar with the allegations in the [Corrected] Verified Shareholder Derivative Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.


DATED: _9/21/2020_____        _____

                                        DAVID STACHOWSKI